J-S15033-25
J-S15034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| GAGE LATONE | : | |
| Appellant | : | No. 1280 WDA 2024 |

Appeal from the Judgment of Sentence Entered September 20, 2024
In the Court of Common Pleas of Beaver County Civil Division at No(s):
CP-04-MD-0000897-2024

| ALEXIS NYE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| GAGE LATONE | : | |
| Appellant | : | No. 1532 WDA 2024 |

Appeal from the Order Entered September 20, 2024
In the Court of Common Pleas of Beaver County Civil Division at No(s):
No. 70024 of 2024

BEFORE: OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED: August 13, 2025**

Appellant, Gage Latone, appeals the judgment of sentence imposed after the trial court found him guilty of 401 counts of indirect criminal contempt for violations of temporary and final protection from abuse ("PFA")

---

[*] Retired Senior Judge assigned to the Superior Court.

orders issued by the Beaver County Court of Common Pleas.[1]  He challenges the sufficiency of the evidence, claiming that the Commonwealth failed to demonstrate that, at the time of his PFA order violations, he had notice of the existence of the PFA orders.[2]  We affirm.

On January 18, 2024, Alexis Nye, the Appellee in the civil matter before us, filed a petition for a PFA order against Appellant, which resulted in the issuance of a temporary PFA order; a hearing for the petition was scheduled for January 26, 2024.  **See** Notice of Hearing and Order, 1/18/24, 1; Order (temporary PFA), 1/18/24, 1-2.  In the petition, Ms. Nye identified herself as a former intimate partner of Appellant, with whom she had a child.  **See**

_____

[1] 23 Pa.C.S. § 6114.

[2] Appellant's brief singularly focuses on the judgment of sentence dated September 20, 2024, at issue in the appeal at 1280 WDA 2024.  He has separately filed an appeal in the related civil matter, involving the grant of the PFA order, which is pending at 1532 WDA 2024.  Appellant's lone brief and the Commonwealth's responsive brief reference our docket numbers for each of these two appeals.  As such, pursuant to Pa.R.A.P. 513, we consolidate these appeals *sua sponte* and address the issues raised in one disposition.

Appellant identified the order on appeal at 1532 WDA 2024 as an order entered on August 20, 2024, in the civil matter at case No. 70024-2024.  **See** Amended Notice of Appeal, 11/22/24, 1 (1532 WDA 2024).  The docket for the civil matter at 70024-2024, however, does not refer to any order filed on August 20, 2024.  Based on the context of Appellant's brief, we are under the impression that order date listed on the amended notice of appeal for 1532 WDA 2025 was a clerical error, and Appellant intended to appeal from the sentencing order issued on September 20, 2024, in both of his pending appeals; the sentencing court listed both trial court dockets numbers for CP-04-MD-0000897-2024 and 70024-24-2024 in the caption of its sentencing order.  Accordingly, we have amended our caption to reflect the date of the order on appeal at 1532 WDA 2024.

Petition for PFA Order, 1/18/24, ¶ 5. She alleged that Appellant held her in a hotel room, that she was unable to leave, that her phone was taken from her, and that Appellant had "beaten[,] silenced, and choked" her. *Id.* at ¶ 7. He allegedly told her "to either take [X]anax and kill [her]self or be beaten and killed by him." *Id.* She noted that she called 911 from Appellant's phone but "the abuse went on for an entire night." *Id.* She also recalled in the petition that, when she was pregnant in the summer of 2023, Appellant had held a gun "up to [her] belly," and, on other occasions, he gave her "a black eye during an argument," a bruised cheek in a different argument, and told her that she would be killed if she ever left him. *Id.* at ¶ 8. The temporary PFA order prohibited Appellant from, *inter alia*, contacting Ms. Nye "by telephone or by any other means, including through third persons." Order (temporary PFA), 1/18/24, 1. A "sheriff's return" filed in the civil matter indicated that service of the "Protection from Abuse" on Appellant occurred at the Beaver County jail on January 22, 2024. *See* Sheriff's Return, 1/22/24, 1.

On January 26, 2024, Appellant appeared for the PFA order hearing via video conferencing. *See* N.T. PFA Hearing, 1/26/24, 2. He agreed that he had criminal charges pending as a result of the incidents alleged in Ms. Nye's PFA order petition. *See id.* at 2-3. Given Appellant's lack of counsel in the criminal matter, the trial court in the civil matter continued the temporary PFA order, with Ms. Nye's consent, until March 1, 2024. *See id.* at 3-4. The same restrictions against contact with Ms. Nye that were addressed in the initial temporary PFA order were included in the new temporary PFA order and were

listed as effective "until otherwise modified or terminated by th[e trial] court." Order (temporary PFA), 1/26/24, 1; *see also id.* at 2 ("Defendant is prohibited from having **ANY CONTACT** with Plaintiff, or any other person protected under this order either directly or indirectly, at any location, including but not limited to any contact at Plaintiff's or other protected party's school, business, or place of employment.") (emphasis in original). Appellant agreed with the court that he understood that the continuation of the temporary PFA order meant that he could "not reach out and try to have any contact with Miss Nye." N.T. PFA Hearing, 1/26/24, 4. A notation at the end of the temporary PFA order indicated that the new temporary PFA order was issued to Appellant's attorney and served on Appellant by mail. *See id.* at 4.

On March 1, 2024, the trial court continued the PFA proceedings in the civil matter while Appellant's related criminal matter was still pending. *See* N.T. PFA Hearing, 3/1/24, 2-5. The court again issued a new temporary PFA order on that date including the existing restriction on Appellant contacting Ms. Nye. *See* Order (temporary PFA), 3/1/24, 1. As with the prior PFA order, the court served a copy of that order on Appellant by mail. *See id.* at 4.

On March 21, 2024, Ms. Nye filed a request to the trial court to withdraw the temporary PFA order, alleging the following:

> I, Alexis Nye, no longer feel the need to be protected from this person. We have been in communication anyways, besides talking about our son (who has never been in any danger himself), and I've seen considerable change and growth on Gage's part. He's taken accountability for his actions, and taken steps towards getting professional help for his anger and other problems. I feel

> like keeping a PFA just to hold it over someone's head who is working to better themselves is wrong.

Plaintiff's Request to Withdraw, 3/21/24, 1. On the same date, the trial court denied her request. *See* Order (dismissal denial), 3/21/24, 1.

On May 22, 2024, the trial court in the civil matter issued Appellant a notice and order to appear informing him that he had been charged with violating the existing PFA order. *See* Notice and Order to Appear, 5/22/24, 1. One day prior, Chief Detective Roger Patrick Young of the Beaver County Detective Bureau filed a complaint for indirect criminal contempt alleging that, between May 1, 2024, and May 24, 2024, Appellant contacted or attempted to contact Ms. Nye 343 times via the Beaver County jail's communication system, in violation of the PFA order. *See* First Complaint for Indirect Criminal Contempt, 5/21/24, 1; Probable Cause Affidavit, 5/21/24, 1. The indirect criminal contempt order was personally served on Appellant at Beaver County's jail on May 22, 2024. *See* Sheriff's Return, 5/23/24, 1. A hearing on the contempt order was continued multiple times due to a request from the Commonwealth and failures to transport Appellant to the court. *See* Order (contempt continuance), 5/31/24, 1; Order (contempt continuance), 6/13/24, 1; Order (contempt continuance), 6/20/24, 1. In the meantime, the trial court issued another temporary PFA order, prohibiting Appellant from contacting Ms. Nye. *See* Order (temporary PFA), 6/7/24, 1-4.

On June 28, 2024, a second complaint for indirect criminal contempt was filed against Appellant, in which Detective Young alleged that, between

May 22, 2024, and June 27, 2024, Appellant continued to violate the PFA order by communicating with, or attempting to communicate with, Ms. Nye in excess of fifty times through the use of other inmates' tablets and calling a third party and having them do a "three-party call" in an effort to circumvent the Beaver County jail's efforts to restrict communication between him and Ms. Nye. Second Complaint for Indirect Criminal Contempt, 6/28/24, 1; Probable Cause Affidavit, 6/28/24, 1.

On July 12, 2024, the trial court heard testimony from Ms. Nye about the events leading to the issuance of the first temporary PFA order, after which it issued a final PFA order to be effective for a three-year period ending on July 12, 2027. *See* Order (final PFA), 7/12/24, 1-4; N.T. PFA Hearing, 7/12/24, 12-18, 23-28. Ms. Nye testified that the event that caused her to file the PFA order petition was an incident where Appellant had made her take pills ("Xanax, something like that") in front of their child to hurt herself; he also beat her and threatened her. *Id.* at 13. She quoted him as telling her, "[I]f [she] didn't take them[, *i.e.,* the pills,] that he would kill [her]." *Id.* Ms. Nye agreed that Appellant had tried to contact her from the jail "[m]any, many times." *Id.* at 14. She also referenced past incidents where Appellant had been abusive to her, alluding to "a couple of bruises" and times when he would "show[] up [to] places where he'd think that [she] was, harassing [her] friends." *Id.* At the time, she agreed that she still feared for her safety from Appellant. *See id.* at 15. Moreover, the court had her confirm her earlier allegation about an incident in the summer of 2023 in which Appellant held a

gun "to [her] belly when [she] was pregnant" with the child she had with Appellant. *Id.* at 16.

On July 22, 2024, the trial court presided over a hearing for the two pending petitions for indirect criminal contempt. The Commonwealth presented testimony from Detective Young, and Appellant presented testimony from Ms. Nye. Detective Young confirmed that, between May 1 and June 13, 2024, there had been 348 telephone or video calls from Appellant at the county jail to Ms. Nye's phone number. *See* N.T. Contempt Hearing, 7/22/24, 16-18, 21-22. Following the detective's report of those calls to the warden, the jail staff "locked down that number" in order to block Appellant from calling Ms. Nye. *Id.* at 20. After Appellant was blocked from contacting Ms. Nye from the jail via phone or video calls, he continued to contact Ms. Nye by text messages, phone calls, and tablet video calls through third-party intermediaries, *i.e.*, fellow inmates. *See id.* at 22-23.

Between May 2 and May 21, 2024, Appellant exchanged 939 text messages with Ms. Nye. *See* N.T. Contempt Hearing, 7/22/24, 23-24. Between May 21 and May 25, 2024, Appellant exchanged 290 text messages with Ms. Nye using a fellow inmate's account. *See id.* at 24. From January 20, 2024, through about two weeks before the July 22, 2024 hearing, Appellant attempted 2,084 calls to Ms. Nye; 745 calls were completed between them from January 20, 2024, to July 9, 2024. *See id.* at 25-26. 154 of the completed calls occurred between May 1 and May 20, 2024. *Id.* at 26. Between January 30 and May 21, 2024, Appellant had 168 "video visits" with

Ms. Nye, 53 of which happened between May 2 and May 21, 2024. *Id.* at 31. From May 21 to June 27, 2024, Appellant had 34 "video visits" with Ms. Nye using the accounts of his fellow inmates. *See id.* at 32-33.

Ms. Nye testified that she would call Appellant for their video calls using a digital application, she would pay for the video calls, and that she would "put money on [Appellant's] books so that [they] could talk on the phone." N.T. Contempt Hearing, 7/22/24, 46-47. She recalled that she came to court on March 21, 2024, to request the court to "drop the PFA" against Appellant but the court denied that request. *Id.* at 48. She also acknowledged the content of the statement she made in support of the request to "drop the PFA." *Id.* at 48-49. On cross-examination, she agreed that the final PFA order was granted based on the allegation concerning "what happened to [her] in that hotel" that she testified to at the final PFA order hearing. *Id.* at 52. She also agreed that there was always an effective PFA order since January of that year, Appellant probably told her that he knew that he was not allowed to talk to her in their calls, and that he told her not to show up for any of their court hearings, though she also noted that she "didn't want to show up either." *Id.* at 52-53.

After hearing all the testimony, the trial court found Appellant guilty of indirect criminal contempt with respect to both pending complaints. *See* N.T. Contempt Hearing, 7/22/24, 54. The court then directed the parties to submit written briefs regarding the court's sentencing discretion. *Id.* at 54-55.

While the sentencing hearing was awaiting a new court listing, Detective Young filed a third criminal complaint for indirect criminal contempt against Appellant with respect to eight more video calls made to Ms. Nye via the Beaver County jail's communication system. **See** Third Complaint for Indirect Criminal Contempt, 8/1/24, 1; Probable Cause Affidavit, 8/1/24, 1. On September 20, 2024, the trial court presided over a combined contempt and sentencing hearing. Detective Young testified that Appellant conducted eight video calls to Ms. Nye, using another inmate's tablet device between July 21 and July 24, 2024. **See** N.T. Contempt/Sentencing Hearing, 9/20/24, 7-15. The court found Appellant guilty of the eight additional counts of indirect criminal contempt alleged in the third criminal complaint. **See id.** at 18. For each of the 401 counts of indirect criminal contempt (343 counts in the first complaint, fifty counts in the second complaint, and eight counts in the third complaint), the court sentenced him to consecutive terms of one to two days' imprisonment with a one-dollar fine assessed for each count for an aggregate imprisonment term of 401 to 802 days. **See id.** at 25-26; Order of Disposition and Sentence, 9/20/24, 1; Order (Sentence), 9/20/24, 1.

On October 17, 2024, Appellant timely filed a notice of appeal from the sentencing order, initiating the appeal presently before this Court at 1280 WDA 2024.[3] **See** Notice of Appeal, 10/16/24, 1. On November 8, 2024, we

_____

[3] On October 28, 2024, Appellant filed a *pro se* petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541, *et seq.*, while the appeal
*(Footnote Continued Next Page)*

ordered the trial court to amend its docket at CP-04-MD-0000897-2024 to accurately reflect the filing of the notice of appeal. *See* Superior Court Order (docket amendment), 11/8/24, 1 (1280 WDA 2024). With respect to the appeal at 1280 WDA 2024, Appellant timely filed a court-ordered concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925. *See* Order (Rule 1925), 10/29/24, 1; Rule 1925(b) Statement, 11/12/24, 1-2.

On November 21, 2024, we issued an order, notifying Appellant that his notice of appeal was not in compliance with *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018) (requiring appellants to file separate notices of appeal when single order resolves issues arising on more than one lower court docket). *See* Superior Court Order (*Walker* noncompliance), 11/21/24, 1. Accordingly, we directed Appellant to file two amended notices of appeal: one containing the trial court docket number for CP-04-MD-0000897-2024 and our docket number for 1280 WDA 2024, and the other containing the trial court's docket number for case No. 70024-2024. *Id.* Appellant complied with that order, and the amended notice of appeal for case No. 70024-2004 initiated the appeal before us at 1532 WDA 2024.[4] *See* Amended Notice of Appeal,

_____

at 1280 WDA 2024 was already pending. Based on our review of the trial court docket at CP-04-MD-0000897-2024, it does not appear that any action has been taken by the trial court with respect to that petition.

[4] The trial court does not appear to have issued any order for a separate Rule 1925(b) statement with respect to the appeal at 1532 WDA 2024. *(Footnote Continued Next Page)*

- 10 -

11/22/24, 1 (1280 WDA 2024); Amended Notice of Appeal, 11/22/24, 1 (1532 WDA 2024). Prior to conducting the instant review, we *sua sponte* ordered the trial court to supplement our record for appeal with the notes of testimony for the proceedings on January 26, 2024, March 1, 2024, and July 22, 2024, which appeared to be *dehors* the record. **See** Superior Court Order (record supplementation), 6/4/25, 1 (1280 WDA 2024). The trial court complied with that directive.

Appellant presents the following question for our review:

> Whether the Appellant's conviction[s] should be reversed because the Commonwealth failed to present sufficient evidence to prove guilt beyond a reasonable doubt as to whether, at the time of the violation[s], [he] had actual knowledge of the PFA order?

Appellant's Brief, 8 (unnecessary numeral prompt omitted).

Appellant challenges the sufficiency of the evidence, arguing that the Commonwealth failed to prove that, at the time of his acts constituting indirect criminal contempt, *i.e.*, his contacts or attempted contacts with Ms. Nye, he had actual knowledge of the existence of a PFA order prohibiting him from contacting Ms. Nye. **See** Appellant's Brief, 10-12. He suggests that the

_____

Nevertheless, the trial court's Rule 1925 opinion appears to address each of the underlying cases for the two appeals before us. However, we further note that although Appellant is not appealing the PFA order, itself, the prothonotary failed to provide requisite notice under Pennsylvania Rule of Civil Procedure 236 for that order. As such, any appeal period for a challenge to the PFA order has not commenced. In any event, the lack of appeal, or any challenge to the issuance of the PFA order, does not have any bearing on our disposition of Appellant's present challenge to the judgment of sentence imposed for violations of that order.

Commonwealth failed to prove its criminal case for the contempt counts by not moving into the evidentiary record at his contempt hearing proof of his knowledge of the PFA order:

> The [trial c]ourt in its [Rule] 1925 opinion references filings in the history of this court case that it believes supports the position that [A]ppellant had notice of the PFA [order]. However, for whatever reason, the Commonwealth chose not to present any of those filings to the trier of fact at the [i]ndirect [c]riminal [c]ontempt [h]earing. Most filings of a court case are not introduced as evidence at trial either because their introduction would not comply with the rules of evidence or constitutional standards. Our criminal justice system in Pennsylvania relies on elected District Attorneys and their assistants to prepare the case that they want the trier of fact to receive, within the rules of evidence and constitutional rights, specifically the confrontation clause. That system fails if we allow the courts to just cherry pick various filings contained within a case, never presented as evidence, [and] never subjected to constitutional or evidential scrutiny.

*Id.* at 11-12.

Our standard of review of a challenge to the sufficiency of the evidence is well settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Bloomer*, 327 A.3d 1282, 1287 (Pa. Super. 2024) (citation omitted). "The trial court, sitting as factfinder at a bench trial, is free

to believe all, part, or none of the evidence presented." *Id.* (internal quotation marks and citation omitted).

"A court may hold a defendant in indirect criminal contempt and punish him or her in accordance with the law where the police have filed charges of indirect criminal contempt against the defendant for violating a PFA order issued pursuant to the domestic relations code." *Commonwealth v. Smith*, 288 A.3d 126, 130 (Pa. Super. 2022) (citing 23 Pa.C.S. § 6114(a)).

> To establish indirect criminal contempt, it must be shown that 1) the order was sufficiently clear to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act must have been one prohibited by the order; and 4) the intent of the contemnor in committing the act must have been wrongful.

*Id.* at 131 (citation omitted).

Appellant's instant claim challenges the existence of sufficient evidence for the second element of indirect criminal content, his notice of the order violated. With respect to this element, our Supreme Court has held that "to convict a defendant of indirect criminal contempt for violating a PFA order, the Commonwealth must demonstrate beyond a reasonable doubt that, at the time of the violation, the defendant had actual knowledge of the PFA order, regardless of how the defendant gained this knowledge." *Commonwealth v. Stevenson*, 283 A.3d 196, 199 (Pa. 2022).

> [T]o be convicted of indirect criminal contempt for violating a PFA order, a defendant must simply have notice of the order, regardless of whether that notice is obtained: (1) by service of a

- 13 -

PFA order; (2) verbally from anyone; or (3) by other scenarios that can establish that the defendant had knowledge of the order.

*Id.* at 206.

In the case at bar, Appellant was found guilty of indirect criminal contempt by contacting or attempting to contact Ms. Nye: (1) 343 times between May 1, 2024, and May 24, 2024; (2) fifty times between May 22, 2024, and June 27, 2024; and (3) eight times between July 21, 2024, and July 24, 2024. During the relevant time periods for those violations, starting with a temporary PFA order issued on January 18, 2024, Appellant was prohibited from contacting Ms. Nye "by telephone or by any other means, including through third persons." Order (temporary PFA), 1/18/24, 1. The prohibition on Appellant's ability to have any contact with Ms. Nye continued through the issuance of multiple subsequent temporary PFA orders and the final PFA order, which remains in effect. *See* Order (temporary PFA), 1/26/24, 1-2; Order (temporary PFA), 3/1/24, 1-2; Order (temporary PFA), 6/7/24, 1-2. Order (final PFA), 7/12/24, 1.

Prior to any of the actions supporting the basis for his indirect criminal contempt counts, Appellant acknowledged in court, as far back as January 26, 2024, his understanding that he was barred from any contact with Ms. Nye due to an effective PFA order:

THE COURT: … Just so you understand, … Mr. Latone, the temporary order is still in effect, so you may not reach out and try to have any contact with Miss Nye. Otherwise, that could get you in a lot of trouble with an indirect criminal contempt.

[APPELLANT]: Yes, yes, ma'am.

N.T. PFA Hearing, 1/26/24, 4.

Even though the January 26, 2024 notes of testimony provide direct evidence of Appellant's notice of the existence of a PFA order prior to his violations, Appellant asserts the evidence was insufficient because the Commonwealth failed to present court filings, including those notes of testimony and the PFA orders with proof of service information, as exhibits at his indirect criminal contempt hearings. *See* Appellant's Brief, 11. Appellant's argument addresses the fact that our scope of review for sufficiency of evidence challenges "is limited to the evidence admitted at trial viewed in the light most favorable to the Commonwealth as verdict winner." *Commonwealth v. Payne*, 327 A.3d 620, 624 (Pa. Super. 2024).

At the first contempt hearing, Detective Young testified to the timeline of the PFA orders prohibiting contact between Appellant and Ms. Nye, starting with the first temporary PFA order issued at the hearing on January 18, 2024. *See* N.T. Contempt Hearing, 7/22/24, 16. Under cross-examination at the same hearing, Ms. Nye averred a likely probability that Appellant told her of his awareness that he was unable to speak with her on calls and confirmed that he discouraged her from attending *any* of the hearings with respect to the PFA proceedings:

> Q. And did he ever say to you that he knew he wasn't allowed to talk to you in these calls?
>
> A. Probably.

Q. And he told you not to show up for any of these hearings; right?

A. I didn't want to show up either, but yes.

N.T. Contempt Hearing, 7/22/24, 53.

While the Commonwealth could have easily established Appellant's notice of the PFA orders at the first contempt hearing by, *inter alia*, asking the contempt court to take judicial notice of the proofs of service on the various PFA orders and Appellant's statement of understanding about the prohibition against contact with Ms. Nye at the January 26, 2024 PFA hearing, we find that Ms. Nye's testimony at the first contempt hearing adequately demonstrated the requisite notice. Viewing Ms. Nye's testimony in the light most favorable to the Commonwealth, as is required under our standard of review, it established that Appellant expressed his awareness of the PFA order and proved that Appellant discouraged Ms. Nye from attending any of the PFA-related hearings, which included multiple hearings, prior to all the charged PFA violations being committed. Accordingly, it established that he was aware of the existence of the PFA orders which were issued prior to the contacts which sustained his contempt convictions.

At the second contempt hearing, at which the trial court found Appellant guilty of the last eight counts of indirect criminal contempt, the evidentiary record consisted of testimony from Detective Young and a pair of jail calls played for the court. **See** N.T. Contempt Hearing, 9/20/24, 5-17. While none of this evidence touched upon the issue of whether Appellant had notice of the

PFA orders in this case, we are unable to find a basis for relief on Appellant's sufficiency claim. As noted by a prior *en banc* panel of this Court, a contempt court, such as the court here at the second contempt hearing, would have been able to take judicial notice of its prior contempt verdicts to conclude that Appellant had the requisite notice of the PFA orders for purposes of the charges brought under the third criminal complaint in this matter. **See Commonwealth v. Taylor**, 137 A.3d 611, 617 n.1 (Pa. Super. 2016) (*en banc*) (noting on sufficiency review: "In reviewing the certified record, we could not find any evidence presented by the Commonwealth with respect to 11 prior violations of the PFA Order or prior convictions for indirect criminal contempt. However, the trial court would be permitted to take judicial notice of any prior violations and convictions.").

Viewing the evidence in the light most favorable to the Commonwealth, Ms. Nye's testimony at the first contempt hearing sustained the notice element for the first two batches of Appellant's indirect criminal contempt convictions. At the second contempt hearing, the court was able to take judicial notice of the violations established at the first contempt hearing for purposes of the notice element at the second hearing. Accordingly, Appellant is not entitled to relief in either of his appeals.

Appeals *sua sponte* consolidated. Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/13/2025